**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1763
_____

SEBASTIAN JACINTO-RAMIREZ,

Petitioner

v.

ATTORNEY GENERAL
OF THE UNITED STATES OF AMERICA,

Respondent
_____

On a Petition For Review of an Order
of the Board of Immigration Appeals
(Agency No. A070-198-272)
Immigration Judge: Rosalind K. Malloy
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 15, 2012

Before: FUENTES, HARDIMAN and VAN ANTWERPEN, Circuit Judges

(Opinion filed: November 20, 2012)
_____

OPINION
_____

PER CURIAM

Sebastian Jacinto-Ramirez ("Ramirez") petitions for review of the Board of Immigration Appeals' final order of removal. For the reasons that follow, we will deny the petition for review.

Ramirez, a native and citizen of Guatemala, entered the United States in March, 1992 near San Ysidro, California. Ramirez applied for asylum on November 12, 1992, claiming that he fled Guatemala after his brother, a political activist, was murdered by members of an opposing group. Ramirez expressed a fear that he too ultimately would have been killed by the same group had he remained in Guatemala.

On August 2, 2006, Ramirez was served with a Notice to Appear for removal proceedings.[1] It is undisputed that Ramirez is removable under Immigration & Nationality Act ("INA") § 212(a)(6)(A), 8 U.S.C. § 1182(a)(6)(A), as an alien present in the United States without being admitted or paroled. Ramirez renewed his request for asylum on the basis of political and ethnic persecution, and appeared for a merits hearing before the Immigration Judge ("IJ") on June 30, 2010. Prior to the hearing, he submitted documents in support of his application. At his hearing Ramirez testified that he and his family belonged to the Christian Democracy Party (also known as the Cristinia Political group), which promotes the rights of Guatemala's indigenous Indian population.[2] His people generally are despised by the dominant majority, he says; they do not speak Spanish, they are mainly farmers, and they have little or no education. The men in his

---

[1] Ramirez's asylum application languished for a time, but apparently it eventually became clear that he would not be eligible for NACARA relief because he did not apply for asylum by the deadline, see 8 C.F.R. § 1240.61(a)(2).
[2] The party is now called the Party of National Advancement.

2

family all were active in the Christian Democracy Party. His father was in charge of the Civil Defense patrol from 1985 to 1996. Eventually, his older brother, an uncle, and two cousins were murdered by political opponents. An aunt and her son also were kidnapped.

Ramirez elaborated that, in November, 1989, a group of approximately twelve armed men, who expressed opposition to the Christian Democracy Party, came to his house and took his brother away. They beat his brother-in-law and killed his nephew. They kicked him Ramirez and struck him in the left eye. Another dozen or so armed men returned to his house in July, 1990. They beat Ramirez's father and hit and kicked Ramirez and his mother. Two days later, the family found his brother's body, prompting Ramirez's father to suggest that the family should flee Guatemala. One year later, Ramirez left for Mexico, eventually coming to the United States. He remains in regular contact with his father, who has told him that there is still injustice for indigenous people in Guatemala. Ramirez's exhibits in support of his claim of persecution included a letter from Alonzo Morales Ramírez, the Mayor of San Ildefonso Ixtahuacán, which states that Ramirez came to the United States because he feared being killed during the "Armed Internal Conflict" that eight members of his family were killed, with "the killers remaining unknown" and that he risks being killed if he returns to Guatemala. A.R. 184. Ramirez also submitted a letter from Andrés Morales of the Bartolomé Community Development Council, which states that Ramirez fled Guatemala because of persecution at the hands of insurgents and the Guatemalan army, and that "various members of his family were kidnapped and never heard from again." A.R. 185. Ramirez also submitted

3

the 2008 and 2009 State Department Reports on Human Rights Practices for Guatemala, and a 1997 State Department Profile of Asylum Claims.

The IJ denied relief, concluding that Ramirez had not established past persecution in the absence of reasonably available corroborative evidence, or a well-founded fear of persecution. The IJ reviewed the background evidence and acknowledged that the indigenous population of Guatemala is discriminated against and mistreated. Despite the fact that they enjoy equal rights under Guatemala's Constitution, they remain largely outside of the political and economic mainstream. During the 1980s, the indigenous population was caught between two warring factions – the repressive government and leftist guerillas. They suffered abuse from both sides, but they were especially targeted by anti-government guerillas. In the early 1980s, thousands of Indians fled their tribal homes in northwestern Guatemala, but they began returning in the mid-1980s, and the United Nations High Commission for Refugees, which supervised large-scale returns, reported that more than 25,000 Indians had returned to Guatemala since 1993. Nevertheless, the IJ was not persuaded by Ramirez's individual evidence and regarded his claim of persecution as uncorroborated. Specifically, she would not give much credit to his letter from the Mayor of San Ildefonso Ixtahuacán, or the letter from Andrés Morales of the Bartolome Community Development Council, because these letters were not authenticated and the translations were not certified.

Moreover, since Ramirez was able to obtain these letters in 2008 from a friend who travels back and forth between Guatemala and the United States, the IJ was critical of the fact that Ramirez did not call this friend to testify. The IJ also was critical of the

4

fact that Ramirez did not seek corroboration from two of his brothers, who live in the United States, or obtain an affidavit from his father. As to Ramirez's fear of future persecution, the IJ reasoned that, even more importantly, his brother's murder occurred about 20 years ago, and Ramirez offered no credible contemporary evidence that conditions in Guatemala remained the same as they were 20 years ago. The IJ noted that Ramirez has family members who have remained in Guatemala and they have never been harmed, even though his father still belongs to the same political party. Ramirez was ordered removed to Guatemala.

On January 13, 2012, the Board of Immigration Appeals dismissed Ramirez's appeal. The Board explained its reasoning, but agreed with the IJ that: (1) Ramirez did not show past persecution and thus was not entitled to a presumption of future persecution; and (2) he did not show a well-founded fear of future persecution. The Board agreed that corroboration of Ramirez's claim of past persecution was necessary and available, observing that his claim of membership in a political party and the deaths of family members was central to his claim of persecution and could have been verified either by his family in Guatemala, or his friend who travels between Guatemala and the United States. The Board also agreed that 20 years had passed since the events recounted by Ramirez had occurred. Also, his family members, who are similarly situated, have remained unharmed in Guatemala.

Ramirez has timely petitioned for review. We have jurisdiction under 8 U.S.C. § 1252(a)(1), (b)(1). In his brief, Ramirez contends that, contrary to the agency's determination, an applicant can sustain his burden of proof where there is independent

objective corroborative evidence of persecution, even where the applicant has credibility problems, see Petitioner's Brief, at 9, the agency ignored favorable evidence, see id. at 12, 16, his testimony was consistent with his country conditions evidence, see id. at 19, and the agency erred in determining that he did not establish a well-founded fear of persecution, see id. at 22.

We will deny the petition for review. An applicant bears the burden of proving eligibility for asylum. See Shardar v. Att'y Gen. of U.S., 503 F.3d 308, 312 (3d Cir. 2007). See also Abdille v. Ashcroft, 242 F.3d 477, 482 (3d Cir. 2001). The Board's findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). See also Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (agency's determination must be upheld if supported by substantial evidence). Under this deferential standard, Ramirez must establish that the evidence does not just support a contrary conclusion but compels it. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).

In order to qualify for asylum, an applicant must establish that he is a "refugee" within the meaning of the Act. See 8 U.S.C. § 1158(b)(1). A "refugee" is a person who is unable or unwilling to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); Shardar, 382 F.3d at 312. To establish eligibility for asylum on the basis of past persecution, an alien must make a credible showing that he suffered some harm rising to the level of persecution on account of a statutorily protected ground, Gao, 299 F.3d at 272. An applicant cannot rely

6

solely on the persecution of a family member to qualify for asylum, but the evidence of Ramirez's brother's "assassination," as he described it in his 1992 asylum application, is relevant to his claim because he shares his brother's political beliefs, and his claim of political persecution rests on the familial relationship. See Cham v. Att'y Gen. of U.S., 445 F.3d 683, 693 (3d Cir. 2006).

The agency was not persuaded that Ramirez suffered past persecution, and, accordingly, demanded corroboration. We have held that corroboration may be required, even from credible applicants, see Abdulai v. Ashcroft, 239 F.3d 542, 554 (3d Cir. 2001), where it is (1) reasonable to expect the applicant to produce corroboration, (2) the applicant fails to corroborate, and (3) the applicant fails to adequately explain that failure. Chukwu v. Att'y Gen. of U.S., 484 F.3d 185, 191-92 (3d Cir. 2007) (citing Toure v. Att'y Gen. of U.S., 43 F.3d 310, 323 (3d Cir. 2006). See also Sandie v. Att'y Gen. of U.S., 562 F.3d 246, 252-53 (3d Cir. 2009) (same). Ramirez's country conditions evidence supported his claim concerning conditions for Guatemala's indigenous population in the 1980s and early 1990s. Corroboration was inadequate nonetheless, just as the agency concluded, because Ramirez did not proffer any documents to corroborate his membership, or the membership of any of his family members, in the Christian Democracy Party, and he provided no statements or letters from any family members who could corroborate his claims concerning the murders of his brother and others, including no statements from his brothers who reside in the United States.

Ramirez's only explanation for this absence of corroboration was that his father is illiterate and unable to write, but he could not explain why other family members or his

friend were unable to corroborate his claims. There were discrepancies in the record concerning what, and how many, murders took place; family members should have been able to clarify and corroborate this important claim. The letter from the Community Development Council was delivered to Ramirez by his friend with whom he remains in regular contact, and yet Ramirez did not proffer him as a witness or otherwise offer a written statement from him. Similarly, Ramirez did not proffer the testimony of either of his two adult brothers who reside in the United States, nor did he offer written statements from them. Ramirez's letter from the Mayor of his home town and his letter from Andrés Morales of the Bartolome Community Development Council were given no weight by the IJ because of authentication and translation issues, but, even if we disagreed with the agency about these shortcomings in this evidence, we would not be compelled to conclude that Ramirez proved past persecution or a well-founded fear of persecution. The letters do not provide specifics about the alleged murders and kidnappings of his family members, or specifics about who in Guatemala would seek to harm Ramirez now, and thus they would not be entitled to much weight.

In sum, Ramirez failed to submit evidence which was reasonably available to support his claim. It was entirely reasonable for the agency to expect Ramirez to corroborate contentions that were central to his claim of political and ethnic persecution. See Sandie, 562 F.3d at 252. Substantial evidence supports the agency's conclusion that Ramirez did not show past persecution and thus was not entitled to a presumption of future persecution. Because Ramirez did not establish a persuasive case that he was

8

persecuted in the past, he does not enjoy a presumption of a well-founded fear of future persecution. Lukwago v. Ashcroft, 329 F.3d 157, 174 (3d Cir. 2003).

Substantial evidence also supports the agency's conclusion that Ramirez did not establish a well-founded fear of future persecution by demonstrating a subjective fear of persecution, and that a reasonable person in his circumstances would fear persecution if returned to the country in question, Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003). As explained by the agency, his father, who was also politically active, continues to live in Guatemala unharmed. Indeed his family, who are also indigenous and were members of the Christian Democracy Party, remain in Guatemala unharmed. His brother's murder occurred more than 20 years ago, and evidence that similarly situated family members continue to reside where the persecution is alleged to have occurred undermines a claim of a well-founded fear of persecution. See Lie v. Ashcroft, 396 F.3d 530, 537 (3d Cir. 2005). Although Ramirez alleged that country conditions have not changed, he proffered no specific evidence to support this claim, and there was no evidence proffered that the individuals who appeared at his house in 1990 are alive today and still interested in him. Although the agency concluded that there is evidence that indigenous people in Guatemala suffer from discrimination, it also correctly noted that Guatemalan law provides for equal rights for indigenous people and obliges the Guatemalan government to respect indigenous people and treat them fairly.

Because Ramirez failed to show past persecution or a reasonable fear of future persecution under the lower burden of proof required for asylum, he was necessarily ineligible for withholding of removal. See Immigration & Naturalization Serv. v.

9

Cardoza-Fonseca, 480 U.S. 421, 430-32 (1987). In addition, the agency held that Ramirez did not meet his burden of establishing that it is more likely than not that he will be tortured upon his return to Guatemala, 8 C.F.R. §§ 1208.16, 1208.18, and the record does not compel a different conclusion.

For the foregoing reasons, we will deny the petition for review.